**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MATT SWART, JEREMY CHONG,** | ) | |
| **GABRIEL EMERSON, and** | ) | |
| **CAEDEN HOOD,** | ) | **No. 19-cv-6213** |
| | ) | |
| **Plaintiffs,** | ) | **Judge John Robert Blakey** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | | |

**DEFENDANT'S PROPOSED COMBINED RESPONSE TO PLAINTIFFS' AND
PLAINTIFF-INTERVENORS' MOTIONS FOR PRELIMINARY INJUNCTION**

Plaintiffs and Intervenors ask this Court to change the rules pertaining to expressive activities that affect the character of Millennium Park, a unique space on the eastern edge of Chicago's downtown, created relatively recently on specially engineered new land. Injunctive relief is, by definition, deemed "extraordinary," and "mandatory" injunctions changing rather than preserving the *status* quo are even more extraordinary and thus harder to obtain. See *Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 960 (N.D. Ill. 2010) (citing *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir.1997)). Both motions for preliminary injunction fail to clear these high hurdles, and should be denied. Indeed, both present classic requests for advisory opinions rather than valid requests for extraordinary equitable relief based on a realistic likelihood of future harm. The *Swart* Plaintiffs seek their injunction against rules governing conduct in Millennium Park despite the facts that (a) the only anecdotal experiences with Millennium Park that they recite occurred before the current rules were drafted; (b) when the current rules were promulgated, Plaintiffs "shared thanks" for them as affording them "freedom" to evangelize within the park; and yet (c) with the input of counsel

1

they have deliberately refrained from availing themselves of this new "freedom."  Matthew

Swart Dep. at 58–60 (Exhibit 1).  The Intervenors seek an injunction allowing them to circulate

petitions during concerts on the Great Lawn despite concededly being little hindered in doing so

in the past and having no plans to do so in the future.  In both instances, standing is lacking to

seek prospective injunctive relief barring application of the current rules.

Moreover, even if there were an injury in fact properly remediable by injunctive relief,

neither set of litigants would be entitled to such relief because neither meets the time-worn

elements of preliminary injunction analysis.  The claims for injunctive relief are all predicated on

the notion that Millennium Park in its entirety is a "public forum."  Plaintiffs have not and cannot

meet their burden to establish this threshold predicate of their respective claims.

Millennium Park is a unique and variegated place and not, as Plaintiffs and Intervenors

posit, the traditional sort of park which is presumptively a "public forum" in constitutional

doctrine.  *See* Journal of the Proceedings of the City Council of Chicago, May 9, 2007, at

104,052–64 (attached hereto as Exhibit 2) (the Park "is a unique center for world-class art,

music, architecture and landscape design, where a person can experience everything from

interactive public art and ice skating to al fresco dining and free classical music presentations….)

Less than a decade-and-a-half old, Millennium Park is the result of an unusual public-private

partnership, and the Park was intentionally divided into discrete, recognizable sub-spaces (in

urban design parlance, "rooms"), some of which include permanent or temporary art which is

curated by the City's Department of Cultural Affairs and Special Events ("the Department").

The overall character of Millennium Park is that of a peaceful refuge from the surrounding urban

bustle, in which visitors can interact with artistic elements and natural vistas.  Indeed, the unique

nature of Millennium Park is confirmed in expert discourse on the topic — it is the root of the

so-called "Millennium Park effect."  ." *See* Edward K. Uhlir, "The Millennium Park Effect," in Greater Philadelphia Regional Review, Winter 2006 at 20–25 (Exhibit 3).  As a world class attraction, the Park is a major tourist draw.  Millennium Park's unique character is inconsistent with the classic "public forum" which is open to one and all for all types of expressive and communicative activities.

Not only does the intentional design and preservation of Millennium Park's character as a curated set of spaces rebut the simplistic notion that it is a generic city park; it also comprises a form of "government speech," the integrity of which would be impaired by the rough-and-tumble of opening the several interior spaces up to the full range of expressive activity contemplated in a public forum.

Finally, even if all of Millennium Park were a public forum, Plaintiffs would not stand any reasonable prospect of prevailing on their claims.  The *Swart* plaintiffs' claim of right is to hand out literature and "outdoor evangelize" in all areas of the park.  The Intervenors' claim of right is to bother audience members immediately before (if not during) classical music and other concerts on the Great Lawn — something the *Swart* plaintiffs consider obnoxious and refrain from doing.  These activities are exactly what the current rules explicitly permit them to do in substantial portions of Millennium Park, namely the wide sidewalks running through the park which visitors must traverse to reach any of the interior "rooms," plus the busy and strategically located Millennium Square at the corner of Michigan Avenue and Randolph Street.  They may also do all of this on the sidewalks surrounding the Park (Michigan Avenue, Monroe and Randolph Streets, and Columbus Drive).  And, of course, on top of this the Swart plaintiffs' religious expression and the intervenors' petition-passing can be done in vast swaths of the rest of the City, including public spaces throughout the crowded downtown area.  In other words,

Plaintiffs assume (wrongly) that the entire area is a public forum, and claim a constitutional entitlement to a minor adjustment of the "place" of expression: they want to be able to "do their thing" a few feet over from where they are now permitted to do it. This claim fails, for even assuming the Park is a public forum, the restrictions are plainly valid regulations of "time, place and manner;" they are content neutral, are narrowly tailored to serve valid governmental interests, and leave ample alternative channels of communication.

Plaintiffs make no bones about their practical agenda: they are mainly interested in unbridled access to Millennium Park visitors in the areas nearest the Cloud Gate sculpture (the "Bean"), on the theory that "you fish where the fish are." *See infra*. But this is no more than a claimed entitlement to "communicate one's views at all times and places or in any manner that may be desired," which is axiomatically not the law. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981); *Int'l Soc. for Krishna Consciousness v. City of New York*, 504 F. Supp. 118, 126 (S.D.N.Y. 1980) ("The court does not think that the First Amendment necessarily guarantees access to the point in New York City where plaintiffs perceive there to be the highest concentration of international tourists...."). As the lead plaintiff admitted, it is reasonable to expect numerous fisherpersons where there is good fishing. Swart Dep. at 94–96 (Exhibit 1). The world (and even the City of Chicago) consists of more people than a handful of students from Wheaton College on Friday evenings and a handful of seasonal petition circulators. Rather, the relevant circumstances are the overall situation that the regulations affect and what would happen in their absence.

Beyond lack of standing for injunctive relief and absence of likelihood of success on the merits, the requested injunctions would be inappropriate under the balancing of harms and public interest prongs of the analysis. With respect to the former, Millennium Park's nature as a curated

artistic, cultural, and natural space (as noted above, a form of "government speech") would be diluted by an injunction allowing disruption of the experience by distributors of pamphlets and other literature, sermons and theological *apologia*, petitions, and any other like expression. This would deleteriously impact the City's interest in the integrity of the intended Millennium Park experience. It would also harm the general public's ability and entitlement to avail itself of that unusual experience by bringing Millennium Park down to the common denominator of the plethora of "public fora" in Chicago, including garden-variety parks, public sidewalks, Federal and Daley Plazas, and so on. In a nutshell, the relief Plaintiffs and Intervenors seek (an injunction allowing them to distribute literature and make speeches in all of the rooms of the park in addition to the interior sidewalks and Wrigley Square) would not massively expand the size of their audience (since the sidewalks where expressive activity is allowed are traversed by all persons entering and exiting the park), but it would detract from the integrity of park visitors' enjoyment of the park's various elements in a major way. It is hard to imagine a starker example of the balance of harms and the public interest weighing against a preliminary injunction.

## ARGUMENT

### I.    Plaintiffs lack standing for injunctive relief.

Plaintiffs' request for a preliminary injunction and a temporary restraining order should be denied because they do not have standing to seek such relief. To invoke the Court's jurisdiction, Plaintiffs must show that they have "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (internal quotation marks and citation omitted). Standing must be evaluated separately for "each form of relief sought," including analyzing a request for injunctive relief separately from a prayer for damages. *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 185 (2000).  Thus, regardless of any past injuries Plaintiffs allege they have suffered in this action, to obtain prospective relief, they must show that:

> (1) [they will] suffer[] an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 180–181; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").  For that reason, the Supreme Court and the Seventh Circuit have held on numerous occasions that past exposure to illegal conduct is insufficient to establish standing to assert claims for prospective relief.  *See, e.g.*, *City of Los Angeles*, 461 U.S. at 106 (past illegal conduct by police officers did not provide standing for prospective relief because possibility of future harm was speculative); *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001) (campaign could not obtain prospective relief based on prior refusal to certify party nominees, since campaign's "assertion that it is likely to be injured in the future in the same way it was injured in this case is purely speculative"); *Robinson v. City of Chicago*, 868 F.2d 959, 966 (7th Cir. 1989) (no standing to seek prospective relief against police investigative processes because it was not "reasonably likely" that plaintiffs would again encounter the police). And even in overbreadth challenges, the plaintiff must still "substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief."  *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012).

In *Schirmer v. Nagode*, for example, the Seventh Circuit applied the above cases to plaintiffs challenging a City ordinance prohibiting "failure to disperse" as disorderly conduct.

621 F.3d 581, 583 (7th Cir. 2010). Plaintiffs in that case were arrested under the provision —

despite the evidence showing that they did not violate its terms — and sued for prospective relief

against its future enforcement. *Id.* The Seventh Circuit held that there was no standing and

reversed the district court's injunction barring enforcement of the provision, because "to present

a justiciable controversy, the person must assert more than a wholly speculative possibility of

criminal consequences." *Id.* at 586 (citing *Babbitt v. United Farm Workers Nat'l Union,* 442

U.S. 289, 302 (1979)). Similarly, the Seventh Circuit upheld a finding in *Sierakowski v. Ryan*

that the plaintiff did not have standing to seek injunctive relief against a law permitting HIV

testing without the patient's consent in certain situations because his "prospects of future injury

[were] purely speculative." 223 F.3d 440, 444 (7th Cir. 2000). And in *Robinson v. City of*

*Chicago*, the Seventh Circuit held that claims of prior arrestees who argued they had been

detained without probable cause had no standing for prospective relief, since the possibility that

they would again violate the law and get arrested was "too speculative." 868 F.2d 959, 966 (7th

Cir. 1989).

      The record is clear that Plaintiffs' and Intervenors' claims of potential future injury are

speculative in the same way as plaintiffs' claims in *Schirmer*, *Sierakowski*, and *Robinson*. First,

the evidence will demonstrate that every encounter Plaintiffs and Intervenors had with staff in

Millennium Park occurred prior to the promulgation of the rules that currently govern activity in

the Park in August 2019 (the "August 2019 Rules"), and no plaintiff or intervenor has returned to

Millennium Park to engage in the activity underlying their claims since the rules were revised.

*E.g.*, (Emerson Dep. 27:18–22 (Exhibit 4); Hood Dep. 102:11–13 (Exhibit 5); Swart Dep. 56:8–

11 (Exhibit 1).) Their encounters with park staff, with one exception, occurred prior to 2019 and

represent, at best, "[p]ast exposure to illegal conduct," which is "insufficient to establish standing

for prospective relief." *See O'Shea*, 414 U.S. at 495–96. And Intervenors do not even have prior encounters with security to stand on, since the record is clear that they were largely permitted to pass petitions on almost every occasion they visited the park as part of their signature-gathering activity in 2016 through 2018.

The August 2019 Rules revised the way speaking and leafletting was regulated in the Park, breaking any chain between Plaintiffs' and Intervenors' past encounters with park security and the necessary showing of future injury. As Plaintiffs recognized, at least some of their experiences with park security would have been different if they had occurred under the revised rules, since some of the very provisions of the rules that purportedly kept Plaintiffs from engaging in their desired activity no longer exist at all. *E.g.*, (Swart Dep. 57:19–58:4 (Exhibit 1) (complaining of pre-speech permitting requirements).) This further suggests that their past injuries are unlikely to be repeated, and at the very least renders their request for injunctive relief as to those specific issues moot. *See Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 262 (3d Cir. 2002) ("[I]f an amendment removes those features in the statute being challenged by the claim, any claim for injunctive relief becomes moot as to those features.") (internal quotation and citation omitted). These revisions did not further hinder Plaintiffs' activity or even continue it in the same way; on the contrary, the promulgation of the August 2019 Rules caused Plaintiffs to "share[] thanks with one another" that the Park was now "more free." (Swart Dep. 59:6–10 (Exhibit 1).) Armed with only a handful of encounters with park security in the past, under regulations that are no longer in force and which gave way to rules that *lessened* Plaintiffs' concerns about their activity in the Park, Plaintiffs and Intervenors cannot show a substantial likelihood of injury in the future.

Nor can Plaintiffs argue that their fear of the revised rules being applied against them in the future represents anything beyond speculation. There is no dispute that Plaintiffs and Intervenors have not sought to enter Millennium Park since the promulgation of the August 2019 Rules. Indeed, the Intervenors have no specific plans to do so at all. And while Plaintiffs claimed in the Complaint that their cessation of activity in the Park was a result of fear of enforcement of the revised rules, their depositions demonstrated otherwise: the decision to refrain from evangelizing in the Park after the promulgation of the August 2019 Rules was driven by their attorneys' instructions, not by a fear of enforcement. *E.g.*, (Hood Dep. 104:21– 105:4 (Exhibit 5).) Plaintiffs' desire to bolster their lawsuit by avoiding the Park is a more logical reason to stay away than any fear of the new regulations; after all, large portions of the Park are explicitly open now to the activities Plaintiffs engaged in in the past and seek to engage in in the future, such as speaking on the sidewalks surrounding or within the Park. *E.g.*, (Swart Dep. 44:19–24 (Exhibit 1).)

In sum, all that Plaintiffs and Intervenors assert is a hazy desire to enter Millennium Park to evangelize or pass petitions in the future — to enter uncertain areas, at uncertain times, to conduct uncertain activities, under new regulations that have never been applied to them and do not appear to forbid much of the activity that led to the lawsuit in the first place. That cannot suffice for standing to pursue prospective relief, especially where the applicability of the August 2019 Rules will wholly depend on their future conduct. Plaintiffs' hypothetical and speculative concerns cannot suffice to show standing for a preliminary injunction that strikes down the August 2019 Rules throughout every area of Millennium Park.

II.     **Plaintiffs have no likelihood of success on the merits**

A.     **Millennium Park is not a "public forum."**

Plaintiffs, of course, have the burden to establish each element of their claim.  The key driver of analysis in a First Amendment free expression case like the one here is what type of forum is involved.  *See Chicago Acorn, SEIU Local No. 880 v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695, 699 (7th Cir. 1988).  Plaintiffs place all of their eggs in the basket of the "public forum."  They do so largely based on semantics: Millennium Park has "park" in its name, and the case law refers to streets, sidewalks and parks as typically being quintessential public fora.  *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  This argument, which places magically determinative power on bare nomenclature, is a classic form-over-substance shortcut.  (By this simplistic logic, had the City named the area in question "Millennium Nonpublic Curated Galleries" or the like, there would be no colorable claim.)  In actual practice, the contrary is the case.  "'The question whether a particular [property] is a public or a nonpublic forum is highly fact-specific and no one factor is dispositive.'"  *Pomicter v. Luzerne County Convention Center*, 939 F.3d 534, 540 (3d Cir. 2019) (quoting *U.S. v. Marcavage*, 609 F.3d 264, 275 (3d Cir. 2010)).  For instance, in *Chicago Acorn*, the Seventh Circuit did not rest on the "sidewalks = public forums" tautology but instead delved into facts to determine that the sidewalks near Navy Pier were not public forums.  150 F.3d at 702.  The court reasoned that those particular sidewalks were not through routes but rather led into the pier itself, which is "its own little world of delights."  *Id.*

A semantic argument strikingly similar to that Plaintiffs make here was rejected in *Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011).  There, plaintiff challenged her arrest for violating regulations prohibiting expressive activities (in her case, dancing) in the Jefferson Memorial.  Relying on *Perry, supra*, she argued that the memorial "is located within the National

Park System, and that public parks are quintessential examples of traditional public forums."
639 F.3d at 552. The court declined what it characterized as Oberwetter's effort to "paint with a single brush for purposes of forum analysis." *Id.* Instead, the court looked at the historical reality: "[i]n creating and maintaining the Jefferson Memorial… the government has dedicated a space with a solemn commemorative purpose that is incompatible with the full range of free expression that is permitted in public forums." The court went on to dispose *seriatim,* of plaintiff's other arguments, including (a) that visitors' regular talking, making noise and posing for photographs had transformed the space into a public forum, *id.*; (b) that its being open to the public made it a public forum, *id*. at 553; (c) that government ceremonies had so transformed it, *id.*; and (d) that the memorial had been open without the challenged regulation for decades, *id.* Finally, the court noted that the memorial's boundaries were clearly delineated spatially from surrounding areas that were public forums, making it clear that people had "'entered some special type of enclave.'" *Id.* (quoting *U.S. v. Grace*, 461 U.S. 171, 179 (1983)).

Similarly, in *Hotel Employees Local 100 of New York, N.Y. v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 551 (2d Cir. 2002), the court found that the plaza fronting Lincoln Center on the northwest side of Manhattan was not a traditional public forum and the ban on leafleting was upheld. The court noted that:

> … the City participated in the creation of the Lincoln Center complex for the purpose of establishing a cultural center devoted to the performing arts, and Lincoln Center, Inc. has sought to limit organized speech in the Plaza to arts- and performance-related events. Thus, despite the fact that the Plaza's design encourages passers-by to enter and pass through the Plaza, by restricting organized expression to arts-related presentations, the City has evidenced an intent to conserve the Plaza's function as an extension of the performing arts complex.

The facts — as opposed to a blanket definition of tne word "park" to which Plaintiffs subscribe — demonstrate that, much like the "world of delights" in *Chicago Acorn*, the "special type of enclave" in *Oberwetter,* and the outdoor "cultural center" in *Hotel Employees*, Millennium Park is *sui generis* and not the type of outdoor park space generally categorized as a presumptive public forum. Plaintiffs do not present factual allegations that it has been used as a public forum. (Intervenors' factual assertions about discrete programs and events organized by the City miss the mark.) The testimony to be presented at the hearing is expected to show that Millennium Park has been designed and maintained as a unique space of refuge from the busy surrounding urban areas, with curated art galleries and natural plantings. The park did not exist "from time immemorial" (or even from the days of Jean Baptiste Point DuSable or Mrs. O'Leary), but was largely created through novel engineering technology which created a new open space above the Illinois Central/Metra tracks. Contrary to Plaintiffs' visceral recoil from the notion that the park contains discrete areas or "rooms" each with its own disparate character, the evidence will establish that this is the case. For example, the Lurie Garden (which, interestingly, Plaintiffs never seem to have managed to visit, perhaps because it is separated from surrounding portions of the park by thick walls of trees) is a world class masterpiece of urban landscape whose plantings, which evolve over the course of the growing year, were designed by the great Dutch landscape designer Piet Oudolf. *See* "Allure of the Lurie," in The New Perennialist blog, https://www.thenewperennialist.com/allure-of-the-luriepiet-oudolf-returns-to-chicago/ (visited October 30, 2019) (Exhibit 6).

The evidence will also demonstrate that Millennium Park is such an unusual and special "world of delights" that it has spawned the term "Millennium Park Effect," referring to the production through a major public-private partnership of an "economic dynamo" that is

"adjacent to the central business district." *See* Edward K. Uhlir, "The Millennium Park Effect,"

in Greater Philadelphia Regional Review, Winter 2006 at 20–25 (Exhibit 3).

> **B.      Because it is a nonpublic forum, the applicable standard is a
> deferential one that is easily met**

A restriction on expression in a nonpublic forum is valid if it is "viewpoint-neutral and

'reasonable in light of the purpose which the forum at issue serves.'" *Marlin v. D.C. Board of*

*Elections and Ethics*, 236 F.3d 716, 719 (D.C. Cir. 2001) (quoting *Perry Educ. Ass'n*, 460 U.S.

at 46–49). *Accord*, *Marcavage v. City of Chicago*, 659 F.3d 626, 633 (7th Cir. 2011), citing

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800 (1985).

"The Government, no less than a private owner of property, has the power to preserve the

property under its control for the purpose to which it is lawfully dedicated." *Jacobsen v. Ill.*

*Dept. of Transportation*, 419 F.3d 642, 647 (7th Cir. 2005) (internal quotations omitted).

"Reasonableness" is deferential and leaves the government with a choice of options: "'[t]he

Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need

not be the most reasonable or the only reasonable limitation.'" *Lavite v. Dunstan*, 932 F.3d

1020, 1030 (7th Cir. 2019) (quoting *Cornelius*, 473 U.S. at 808). Again, Plaintiffs advance no

serious argument that limiting literature distribution or speech-making to Millennium Park's

interior and exterior sidewalks and the Millennium Park room is viewpoint-based. And it is

eminently reasonable in light of the fact that transforming the remainder of the Park into a

raucous public forum would significantly detract from its intended nature as a place for engaging

with art and musical programs and engaging in quiet enjoyment without recurrent interruptions

by strangers. This test, which is highly deferential, *see Summum v. Callaghan*, 130 F.3d 906,

916 (10th Cir. 1997), is easily met.

**C.      The City's curation and programming of Millennium Park is government speech, further supporting the challenged rules**

While the Plaintiffs simply denigrate the art installations and other curated experiences and urban design features in Millennium Park as insufficient justifications for the challenged restrictions, the Intervenors go a step further: they argue that the City, by organizing and sponsoring major events like a mass civil union ceremony, a mayoral inauguration, or a visit by the president of Poland, has opened the Park up as a public forum for one and all.  They might as easily argue that the first playing of Beethoven's Fifth by the Grant Park Symphony did so.  The argument is wholly misplaced.  It would mean, among other things, that this or any bandshell in a government-owned space must never be used for its intended purpose or else the surrounding spaces will become public fora forevermore.  But Intervenors are raising (inadvertently) an important issue: the doctrine of "government speech."  In *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), plaintiffs asserted that because a public park had accepted eleven permanent displays, including one of the Ten Commandments, it was required to also accept a monument containing the "Seven Aphorism of Summum."  The Supreme Court disagreed.  It found that by selecting certain permanent monuments, the government was itself "speaking." While the government had not itself designed or built the monuments, it had selectively chosen those it wanted to install in the park.  It would be absurd, the Court continued, to require the government to take all contributed monuments once it had selected one.  Because the selection (that is, "curation") of public art constituted government's speech, the First Amendment simply did not impose any limitations on the government.

**D.      Even if Millennium Park were a public forum, the challenged restrictions easily meet the "time, place and manner" test**

Plaintiffs do not suggest in any way that the restrictions at issue are content-based. Intervenors hint at a content-based argument because the City has presented some major events

in the Pritzker Pavilion, but this makes little sense since those events government speech just like the Park's curated sculpture exhibits, its Jazz, Blues, Gospel, World, and Classical music festival concerts, and other events sponsored and organized by the City. Since the rules are neutral on their face and there is no colorable argument that they are content based, the applicable test (again, this assumes a public forum, which the City disputes) is well-established: time, place and manner restrictions "'are constitutional, if they: (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information.'" *MacDonald v. City of Chicago*, 243 F.3d 1021, 1032 (7th Cir. 2001) (quoting *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828 (7th Cir.1999)). Each aspect of the test is easily met.

First, the restrictions are justified without regard to content. Any handing out of written materials, and any giving of speeches, would be disruptive and are thus limited to certain portions of the park and its surroundings. Second, the restrictions are narrowly tailored: written materials are a discrete potential disruption, since it is reasonable to expect a plethora of flyers, screeds, tracts and the like would be offered to visitors at Cloud Gate as well as others enjoying the park's other views and pleasures. Making speeches (i.e., loud centralized declamations as opposed to ambient conversation) similarly stand to bother park visitors and detract from the Park's intended character. It is these expressive activities that are limited to sidewalks and Millennium Square.

Third, and finally, the challenged regulations are the paradigm for ample alternative channels. As noted above, the passing out of literature and making of speeches is expressly allowed on sidewalks and in Wrigley Square[1] — substantial swaths of territory within

---

[1] Plaintiffs argue that the City is hypocritical in allowing the making of speeches and handing out literature in Wrigley Square because the Millennium Monument is "art" and its admirers would be

Millennium Park itself.  They are also allowed on the sidewalks immediately surrounding the

Park.  For instance, in *Marcavage*, the court found that the City implemented valid time, place,

and manner restrictions outside of Soldier Field when police officers ordered members of a

Christian ministry to change the location of their outreach activities.  659 F.3d at 631.  The

plaintiffs were asked to move off the sidewalk around Soldier Field and onto a gravel area

nearby, and at Wrigley Field they were ordered to move across the street from the stadium.  *Id*.

When the plaintiffs protested about their relocation, the court noted that "the fact that the

permissible locations were not the plaintiffs' preferred venues does not render them inadequate"

and that "the First Amendment does not guarantee the right to communicate one's views at all

times and places or in any manner that may be desired."  *Id*. (internal quotations omitted).

Importantly, while Plaintiffs now press for a constitutional entitlement to evangelize near

the "Bean," on the grounds that it provides better "fishing" than the interior sidewalks, the very

dispute with Park Security alleged in the Complaint cuts against this: in December 2018,

Plaintiffs determined that more northerly of the East-West interior sidewalks was where they

wanted to conduct their expressive activities.  Jeremy Chong Dep. at 54–62 (Exhibit 7).  This is

exactly where the current rules — with their "new freedom" — expressly permit such

expression.

Moreover, Plaintiffs' activities are, of course, allowed in many, many other places in

downtown and the rest of the City.  *See Ayres v. City of Chicago*, 135 F.3d 1010 (7th Cir. 1997)

("It is one thing to ban peddlers, including… 'First Amendment' peddlers, from Grant Park; it is

another to ban the latter from the surrounding streets as well.  The necessity for, and hence the

reasonableness of, so extensive a ban is questionable.)  Plaintiffs and Intervenors alike admit to

---

distracted.  As the testimony will establish, the monument is "architecture" as distinguished from "art."
In any event, if any text or set of words is appropriate for simplistic literal interpretation, the complex
relation between "art" and "architecture" is not among them.

conducting their activities in various parts of the City — there is nothing unique about the
potential audience in Millennium Park as opposed to elsewhere in the City, nor is there anything
unique about visitors to the Park while they are on the sidewalks as opposed to in the "rooms."
*See ISKC, Inc.*, 504 F. Supp. at 128–29 (finding that it was a proper time, place, and manner
restriction barring proselytizing and soliciting on the streets fronting the United Nations
Headquarters, when other streets nearby were open for first amendment activities)[2]  (As
established above, there is no entitlement to communicate one's views exactly as one wishes.)
The ampleness of the alternative channels of communication, and the limited geographic space
(or "place") where the restrictions apply, render them plainly constitutional, even if the Park
were deemed a public  forum.

> **E.**     **Plaintiffs' and Intervenors' vagueness and overbreadth challenges are
> without merit**

Both Plaintiffs and Intervenors also argue that the rules are unconstitutionally overbroad
and vague, and hence facially invalid.  They seek to bring their claims within the somewhat
relaxed standards for facial challenges in the First Amendment context.  *See Bell*, 697 F.3d at
454.  However, those standards are not so relaxed as to infuse these litigants' claims with any
merit.  Moreover, none of the events and interactions giving rise to the Motions for preliminary
injunction involve a factual dispute or confusion over the meaning of various words. "Facial
invalidation for technical overbreadth is strong medicine, and is inappropriately employed unless
the statute substantially criminalizes or suppresses otherwise protected speech vis-à-vis its
plainly legitimate sweep.  *Id.* at 455 (internal quotations and citations omitted).  Here, there is a
tight fit between the limitations on expression and the governmental interests underlying them.

---

[2] The plaintiffs' argument that visitors at the U.N. were "people at leisure, not walking to or from their
places of employment, and accordingly more receptive to plaintiff's religious message" was irrelevant
when other alternatives were available for the plaintiffs' to convey their message.  *Id.* at 127.

Moreover, the same activities (literature distribution and making speeches) are explicitly allowed in the immediate vicinity of where they are restricted.  In other words, just as the regulations are narrowly tailored to promote a legitimate interest and leave ample alternative channels of communication (if the public forum test were to apply), and are reasonable (under the nonpublic forum test which the City contends is the applicable one), by the same token they are not appropriate candidates for the "strong medicine" of facial invalidity.  Plaintiffs' purely speculative parade of horribles of other speakers not before the Court whose speech might be disallowed by the rules are inventive, to be sure, but unpersuasive.

The same basic analysis applies to the "vagueness" aspect of Plaintiffs' and Intervenors' claims.  *See Center for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) ("[i]n the First Amendment context, vagueness and overbreadth are two sides of the same coin").  But "a 'plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"  *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 495 (1982)).  This by itself is fatal to the vagueness challenge here, since passing out of literature, "open air evangelizing," and distributing petitions are clearly expressive activities limited to sidewalks and Millennium Monument.  (Because subsection P.3. explicitly governs these activities, they are outside the scope of subsection P.1, which pertains to disruptive *conduct* of which several illustrative examples are given.)  And, as with the overbreadth issue, there is no plausible claim that a "substantial" amount of speech may be chilled by the rules, even as inventively [mis]read by Plaintiffs and Intervenors.

F. **Intervenors cannot show a likelihood of success on their Illinois constitutional claims**

Intervenors also base their request for a preliminary injunction on Article XIV, section 3 of the Illinois Constitution, but they cannot succeed on any such claim. That section provides for amendment by public referendum of Article IV of the constitution (establishing the state legislature), and provides that "[t]he procedure for determining the validity and sufficiency of a petition shall be provided by law." Ill. Const. art. XIV, § 3. Article XIV was intended as a popular check on the Illinois Legislature because the "'[state] legislature, being composed of human beings, [would] be reluctant to change the provisions of the constitution that govern its structure and makeup, the number of its members, and those sorts of provisions.'" *Coal. for Political Honesty v. State Bd. of Elections*, 83 Ill. 2d 236, 245 (1980) (quoting constitutional convention proceedings). Reasoning that a "necessity to protect the rights conferred [by Article XIV] from debilitating legislation is implicit in the convention's action," the Illinois Supreme Court has interpreted the Illinois Constitution as protecting the Article XIV initiative process from "unnecessarily burdensome legislative restrictions" enacted by the state legislature. *Coal. for Political Honesty*, 83 Ill. 2d at 247, 248. But that logic and holding do not apply to this case.

First, Article XIV section 3 applies to referenda that are aimed at structural and procedural provisions of Article IV of the Illinois Constitution. It does not apply to the referenda for which Intervenors were collecting signatures in this case, which sought to revise the City's home rule system of government as permitted by section 6(f) of Article VII. The same concerns of self-protection by the state legislature against Article XIV referenda are simply not present in Article VII referenda, which are subject to oversight by state law. Indeed, the limited case law interpreting sections 6(f) and 11 of Article VII has not found the same limitations that are inherent in Article XIV, and instead has held that the legislature may impose reasonable

19

conditions on its exercise. *See Koeppel v. Ives*, 92 Ill. 2d 523, 527 (1982) ("[T]he right of voter initiative created by section 11(a) is a limited one which is subject to reasonable regulation by the legislature.").

Second, even if there were some constitutional limitation on the ability of local governments to regulate the Article VII referendum process, they do not apply here because the August 2019 Rules do not regulate the local referendum process at all — they regulate conduct in Millennium Park. To hold that any generally applicable municipal law or regulation that may incidentally touch on the right to gather petitions must pass strict scrutiny would grind local government to a halt: canvassers would have the right to storm busy intersections to flag down drivers for signatures, venue capacity limits would have to give way to allow advocates to access large crowds to gather signatures, and parks and city buildings would have to be thrown open at all hours to permit maximum signature-gathering potential. These perverse effects are not contemplated by the text or purpose of the relevant provisions of the Illinois Constitution, and this novel claim should be rejected.

## III. The other factors weigh against a preliminary injunction.

Once a plaintiff establishes a likelihood of success and irreparable harm, only then can the court consider the final two factors to determine whether a preliminary injunction should issue. *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997). The final two factors include (3) balancing the harm to the defendant if the injunction were granted "against the harm to the plaintiff if it were not; and (4) the public interest, or the effect that granting or denying the injunction would have on third parties." *Id.* Here, neither factor weighs in favor of the Plaintiffs.

### A.    Balancing the harms favors the status quo.

An injunction should not issue "if the harm that it would work to the defendant substantially outweighs the harm to the plaintiff without the injunction. *MacDonald* at 357; *Ayres v. City of Chicago,* 125 F.3d 1010, 1012 (7th Cir.1997) ("The balance between the harm to the plaintiff if injunctive relief is denied and the harm to the defendant if it is granted is a critical consideration in deciding whether to grant a preliminary injunction."). When the balance of harms tips so strongly in the defendant's favor, a stronger showing of likely success is required. *MacDonald* at 357. There is no harm to a plaintiff who has disavowed any interest in activity violating the rules. Certainly there is no harm to a plaintiff who has expressly endorsed the rules as liberating him for future activity.

In weighing the balance of harms, it is important to pay due regard to the breadth of the First Amendment freedoms at issue. Because speech and expression in public for a must be allowed without regard to content, the public square can be a raucous place. For instance, some of Plaintiffs' message may involve negative comparisons to other religions. *See* Hood Dep. at 78-81 (Exhibit 5) ("And Muhammad isn't perfect. You know, all of these other religions, they're not — they don't have a savior who is perfect. The only one was Jesus. So we need these people to know this, because if they don't come to Jesus, then they are going to p[e]rish in hell."). Any number of other speakers on the great issues of the day (or of the ages) may have controversial views and may draw counter-speakers. To be clear, the City has the greatest regard for the First Amendment and takes seriously the vast range of messages it protects. The point is simply that this very breadth of expression should not be lost sight of in evaluating the effect of transforming a quiet set of outdoor gallery spaces, which draws tourists from around the world, into a noisy public forum.

The City has a substantial interest in preserving Millennium Park for its intended purpose. It is a curated outdoor cultural center for the display of art and performance-related events, and the City has evidenced an intent to conserve the Park's function as an extension of the cultural and artistic institutions that surround it, including the Chicago Cultural Center and the Art Institute of Chicago. *See MacDonald*, 132 F.3d 355, 360 (7th Cir. 1997) (finding that the Park District's permit requirement for certain events at Grant Park should not be enjoined, in part, because the Park District had a "significant interest in maintaining Chicago's parks in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them.") (internal quotations omitted); *see also Hotel Employees Union, Local 100  v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 556 (2d Cir. 2002) (finding that a prohibition on leafleting was reasonable where the City had a substantial interest in preserving a public outdoor plaza "as an area singularly dedicated to Lincoln Center events and other artistic performances.")

The City also has a substantial interest in maintaining a safe, tranquil, and enjoyable environment in what is likely the City's chief cultural venue which attracts millions of tourists to the City and has revitalized the City's central business district. *See* Uhlir, "Millennium Park Effect" (Exhibit 3), *supra*. For instance, in *Acorn*, the court noted that the Metropolitan Pier & Exposition Authority has "a legitimate and substantial interest" in preventing activities that would diminish revenues at Navy Pier. *Chicago Acorn*, 150 F.3d at 702. Additionally, in *Chad v. City of Fort Lauderdale*, a plaintiff challenged the city's regulations prohibiting the soliciting, begging or panhandling on the city's beach and abutting sidewalk. 861 F. Supp. 1057, 1058 (S.D. Fla. 1994). The court noted that the city's beach was "unique" and "is the City's chief asset [because] [t]he beach's rehabilitation and redevelopment as a resort destination plays an

integral part in the City's economic development plans." *Id.* at 1063; *ISKC, Inc.*, 504 F. Supp at 126 ("The court appreciates that rights granted by the First Amendment are of the utmost importance, but holds that the governmental interest in the protection of the U.N. Headquarters outweighs the comparatively minor restrictions placed on plaintiffs" which required them to engage in their conduct across the street.)

Since the opening of Millennium Park, the City has discouraged distracting and intrusive organized expression, including leafleting throughout the park, except for Wrigley Square and the streets that surround the Park. Only recently has the City permitted expressive activity on most of the interior sidewalks of the Park, but the Plaintiffs and Intervenors want more. They seek the ability to reach pedestrians and tourists anywhere and everywhere, including immediately next to the main attractions, such as Cloud Gate and Pritzker Pavilion. But the Plaintiffs and Intervenors have access to all the pedestrians who wish to interact with the Millennium Park's attractions because they are allowed to engage in their expressive activity within earshot of Cloud Gate and outside the Great Lawn's security perimeter. As mentioned above, an injunction allowing Plaintiffs and Intervenors to access the rooms would not increase the size of their audience since they can interact with pedestrians when they enter and exit the rooms. The harm to Plaintiffs and Intervenors is miniscule compared to the balance of harms that inclines so strongly in the City's favor.

**B.    The public interest also weighs against injunctive relief.**

The benefit to the public is minimal should an injunction issue, when compared to the benefit to the public in allowing the City to maintain Millennium Park "in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy" the Park and all of its amenities. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 308 (1984) (upholding a prohibition on a round-the-clock demonstration on the national mall).

The benefit to the public is nominal if the Plaintiffs are allowed to engage in speech and petitioning activities beyond where they are currently permitted under the Rules. Indeed, Plaintiff's target audience can still be reached by conveying their message along the sidewalks and at the entrance of the many rooms throughout Millennium Park. This case is dissimilar to *Ayres v. City of Chicago*, which involved a designated no-peddling zone that prevented the plaintiffs from selling merchandise advocating of the legalization of marijuana in Grant Park. 125 F.3d 1010 (7th Cir. 1997). The plaintiffs were successful in obtaining an injunction, but the court noted that the size of the no-peddling zone, which consisted of all of downtown and large swaths of the Westside, was a significant factor. *Id*. at 1015–16 (noting that the "case would be in a different posture if the designation had been limited to Grant Park, for then [plaintiffs] could peddle their T-shirts to people entering and leaving the park."). Here, Plaintiffs are allowed to convey their speech within the Park; their message is no way diluted by requiring that their conduct occur just outside the rooms.

As discussed in *MacDonald*, an injunction that prohibits the City's Park District form enforcing its rules "would severely hinder the Park District in its attempt to protect the parks and those who use them...[and the injunction] potentially harms the parks themselves as well as potential users, a result that cannot be squared with the public interest." *MacDonald*, 132 F.3d at 361. Similarly, in *Chad v. City of Fort Lauderdale*, the court found that the city's interest in "maintaining a safe tourist zone outweighs plaintiffs' interest in soliciting, begging or panhandling" and that it was in the public interest to maintain the safety of the city's beach. 861 F. Supp. at 1064. The public interest in experiencing the magnificent art and performances in a calm and tranquil environment, and in maintaining a vibrant tourist attraction that serves as an

economic engine for the City, is of great benefit to the public and outweighs any interest

obtained from the issuance of an injunction.

WHEREFORE, for the foregoing reasons, the City respectfully requests that the Court

enter an order denying Plaintiffs' motions for a preliminary injunction and a temporary

restraining order and Intervenors' motion for a preliminary injunction, and ordering such further

relief as is just and proper.

Date:   November 4, 2019                              Respectfully submitted,

JOHN L. HENDRICKS
john.hendricks@cityofchicago.org
ANDREW S. MINE                                       MARK A. FLESSNER,
andrew.mine@cityofchicago.org                        Corporation Counsel for the City of Chicago
OSCAR PIÑA
oscar.pina@cityofchicago.org                         By:      /s/ *Andrew S. Mine*
BRADLEY G. WILSON
bradley.wilson@cityofchicago.org
City of Chicago Department of Law
Constitutional and Commercial
 Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-7220 / 742-0797 / 744-7686

*Attorneys for Defendant*