**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MATT SWART, et al.,

      Plaintiffs,

      v.

CITY OF CHICAGO,

      Defendant.

Case No. 19-cv-6213

Judge John Robert Blakey

**MEMORANDUM OPINION AND ORDER**

This case centers around Millennium Park, a beloved public park and major tourist attraction for the City of Chicago. The City views the Park as a unique space—one that showcases world-class art, music, architecture, and landscape design. Accordingly, the City enacted restrictions it claims protects the Park's aesthetic integrity.

Despite these good intentions, however, the City's restrictions prohibit reasonable forms of expression in large areas of the Park. As a result, Plaintiffs Matt Swart, Jeremy Chong, Gabriel Emerson, and Caeden Hood sued the City, claiming the City's restrictions violate their First Amendment rights to evangelize and disseminate religious literature. Intervenors Elizabeth Norden, Tyler Brumfield, Doris Davenport, and William Morgan also challenge the restrictions, claiming that the restrictions unconstitutionally limit their right to circulate petitions in the Park.

1

Both groups move for a preliminary injunction against the City, asking this Court to enjoin the City from enforcing those restrictions. [7] [35].

For the reasons stated below, this Court grants their motions.

## I. Background

### A. Procedural History

On September 18, 2019, Plaintiffs—four Wheaton College students—filed their complaint against the City. [1]. Plaintiffs, members of an outreach ministry known as the Chicago Evangelism Team, claim that the City's newly enacted rules governing the Park violate their First Amendment rights to freedom of speech (Count I) and free exercise of religion (Count II), as well as the Illinois Religious Freedom Restoration Act (Count III). *Id.* ¶¶ 46–64. That same day, Plaintiffs also moved for a preliminary injunction on their freedom of speech claim, urging this Court to enjoin the City's enforcement of the new rules. [7]. A few weeks later, on October 8, 2019, Plaintiffs moved for a temporary restraining order on the same claim. [22].

On October 10, 2019, this Court granted leave for Elizabeth Norden, Tyler Brumfield, Doris Davenport, and William Morgan to file a complaint in intervention in this case. Intervenors, individuals who regularly circulate referendum petitions in the Park, assert a two-count complaint against the City for unconstitutionally restricting their freedom of speech and petition (Count I) and for violating their right of referendum under Illinois law (Count II). [18-1] ¶¶ 17–29. Intervenors subsequently also moved for a preliminary injunction against the City. [35].

This Court held an evidentiary hearing on the pending motions on November 7 and 8, 2019. The parties then presented closing arguments on November 20, 2019.

### B.    Factual Background

### 1.    Millennium Park

The Park opened in 2004.  [48-2] at 48.  It sits on 24.5 acres of land bordered by Michigan Avenue, Monroe Street, Randolph Street, and Columbus Drive.  *Id.* at 43, 51.  The Park is free and open to the public and contains multiple green spaces and recreation areas.  *Id.* at 157–58.  The City's website refers to Millennium Park as a "public park" and describes it as a "town square."  *Id.* at 95, 104.

Scott Stewart, Executive Director of the Millennium Park Foundation (the Foundation), testified at the evidentiary hearing.  Formed in 1998, the Foundation constitutes a private non-profit organization created to raise private funds to construct the Park.  [48-2] at 41.  The Foundation used those private funds to engage artists and architects to complete the various artistic components of the Park before ultimately donating the Park back to the City.  *Id.* at 44.  The Foundation remains partnered with the City and serves as the chief curators of the public art within the Park.  *Id.*  Specifically, the Foundation reserves the right to voice any objections to the City's Department of Cultural Affairs and Special Events (DCASE) regarding the City's curation of arts and programming in the Park; the City, however, possesses no contractual obligation to act upon or heed those objections.  *Id.* at 97.

In Stewart's opinion, differences exist between the Park and other Chicago parks, the most important one being that the City intends the Park to serve as an artistic and architectural showcase.  *Id.* at 49.  According to Stewart, the Park consists not of a single, undifferentiated space, but rather of several subspaces (or "rooms") differentiated by, among other things, lines of trees or other foliage, changes

in topography, and changes in the color of walking surfaces. *Id.* at 43. A map of the Park below depicts the Park and the location of the various "rooms," as conceptualized by the City:



[1] at 39. For instance, the City considers Cloud Gate—the "room" containing the iconic Bean—differentiated from the other "rooms" by a change in elevation. [48-2] at 47. Similarly, the City considers Lurie Garden separated from other "rooms" by the existence of two large shoulder hedges on its west side. *Id.* at 53. Another one of the so-called "rooms," the Great Lawn, primarily functions as a place for overflow audiences to gather during (and just before) special events held at the Jay Pritzker Pavilion. [48-2] at 59. Some of those events include the Jazz Music Festival, movies, and orchestral concerts. *Id.* Unless open for an event, the Great Lawn remains closed-off by a yellow rope surrounding its perimeter. *Id.* Notwithstanding, Stewart concedes that the Park is otherwise a "thoroughfare." *Id.* at 86.

4

### 2.     Plaintiffs and Intervenors

Intervenors regularly circulate petitions within the City.  [18-1] ¶¶ 9–10.  Norden, for example, has gathered signatures inside the Park (including on the Great Lawn when open to the public) in support of binding referendums for the city-wide ballot. [36-1] at 2.  Norden says she experienced multiple episodes of harassment by Park security, staff, and officials, including times when they prevented her from circulating petitions.  *Id.*

From 2016 to 2018, Intervenor Morgan habitually attended events in the Park to collect signatures; he says that on several occasions Park officials approached him and asked him to leave.  *Id.* at 6–7.  The two other Intervenors, Davenport and Brumfield, circulated petitions between June and August 2018. [36-1] at 10, 13.  On one occasion in June 2018, Park employees refused them access to the Jay Pritzker Pavilion.  *Id.* at 11, 13.  When Davenport attempted to proceed, officials threatened to arrest her.  *Id.* at 11.  Ultimately, Park officials informed Davenport she could proceed with collecting signatures, so long as she agreed to cease before any movie or performance began.  *Id.*

All four Intervenors expressed an honest desire to continue to gather petition signatures in the Park in the future.  [36-1] at 4, 8, 14; [48-1] at 47.  Indeed, at the hearing, Davenport testified that she considers the Great Lawn to be the best location in the entire City to collect signatures.  [48-1] at 47.

Plaintiffs, members of the Chicago Evangelism Team, engage in open air evangelizing and dissemination of religious literature every Friday.  *Id.* at 7–8; [1] ¶¶

5–8. As Plaintiff Chong testified, open air evangelizing involves standing up and "shar[ing] the gospel," an event that can last several minutes at a time. [48-1] at 12–13. The Team engages in these activities in various downtown Chicago locations, including around the Chicago Theatre and Block 37. *Id.* at 14–15. But the Team considers the Park—and especially the area surrounding the Bean—to be the most effective place to share their message because they can reach larger audiences. *Id.* at 8–9, 20–21.

In December 2018, Swart, Hood, and other members of the Chicago Evangelism Team gathered at the Park to engage in open air evangelism and distribute religious literature. [1] ¶ 16. Park security approached Plaintiffs and informed them they were prohibited from disseminating literature. *Id.* ¶ 17. The students ceased distributing their literature, *id.*, and then Hood began to evangelize, *id.* ¶ 18. After a few minutes, Park security again approached Plaintiffs and informed them they had to stop evangelizing. *Id.* At that point, Swart informed security staff that because they were on a public sidewalk, they had the right to continue speaking. *Id.* ¶ 19. A security guard insisted he was "just doing his job," and informed the students they could speak to his supervisor. *Id.* ¶ 20. Based on the guard's intervention, these students then ceased their evangelism activities. *Id.* ¶ 21.

About ten minutes later, Chong arrived at the Park, and the students informed him what had just transpired. *Id.* ¶ 22. Chong nonetheless began evangelizing. *Id.* ¶ 23. Park security then approached Chong and directed him to stop. *Id.* ¶ 24. Chong asked to speak with a supervisor. *Id.* Soon thereafter, two Park supervisors arrived

and informed the students that they were in violation of a Chicago ordinance prohibiting solicitation on the sidewalk between Randolph and Roosevelt Streets. *Id.* ¶ 25.

Members of the Chicago Evangelism Team returned to the Park in the subsequent weeks; they again attempted to evangelize but Park security guards prohibited them from doing so. *Id.* ¶¶ 27–28. On one occasion, Park employees prohibited them from evangelizing near the Bean. *Id.* ¶ 30. On another occasion, a Park employee informed them they could not discuss religion in the Park and ordered them to leave the Park if they wished to speak about religion. *Id.* ¶ 31.

On April 5, 2019, Chong again went to the Park to evangelize; at that time, Public Recreational Operations Manager Christopher Deans approached Chong and provided him with newly enacted rules governing the Park. *Id.* ¶ 32. Deans informed Chong that the rules restricted Chong's activities. *Id.* The rules, which became effective April 2, 2019, provided in relevant part:

> P.    Disruptive Conduct
>
> 1. Any conduct, even if not specifically noted by these Rules, is prohibited in the Park if it interferes with or disrupts another visitor's peaceful enjoyment of a performance or amenity in the Park, endangers public health or safety, may damage Park property, or is prohibited by applicable federal, state, and local laws.
>
>     . . .
>
> 3. Any displays, speeches, or demonstrations on Park property must be approved by DCASE [the Department of Cultural Affairs and Special Events] and Park Management, which may impose reasonable time, place, and manner restrictions and may require a permit.

4. Millennium Park is divided into several outdoor "rooms," each with its own purpose or art. These rooms are: the Jay Pritzker Pavilion and the Great Lawn; the Lurie Garden; Cloud Gate Plaza; Chase Promenade North; Chase Promenade Central; Chase Promenade South; Boeing Gallery North; Boeing Gallery South; Wrigley Square and Millennium Monument; McCormick Tribune Plaza and Ice Rink; and Crown Fountain. Sidewalks surround Millennium Park and connect to sidewalks within the Park, which connect the rooms but are not part of the rooms. The making of speeches and the passing out of written communications shall be restricted to Wrigley Square and Millennium Monument and the sidewalks in and around the Park, though closed sidewalks, whether for an event or another reason, shall not be available for this purpose.

[1] at 22–23.

Through counsel, Plaintiffs wrote the City on May 16, 2019, outlining their opinion that portions of the rules encroached upon their First Amendment rights. *Id.* at 25–27. Plaintiffs claim, and the City stipulates, that the City amended the rules on August 26, 2019 in response to Plaintiffs' concerns. *Id.* ¶ 35; [48-2] at 135. The latest version of the new rules, which the City currently implements, provide:

P.     Disruptive Conduct

1. Conduct that objectively interferes with visitors' ability to enjoy the Park's artistic displays, including, but not limited to, substantially impairing pedestrian traffic, disrupting views of the art, or conduct that endangers public health or safety, may damage Park property, or is prohibited by applicable federal, state, and local laws, is prohibited in the Park.

. . .

3. Millennium Park is divided into several outdoor "rooms," each with its own purpose or art. These rooms are: the Jay Pritzker Pavilion and the Great Lawn; the Lurie Garden; Cloud Gate Plaza; Chase Promenade North; Chase Promenade Central; Chase Promenade South; Boeing Gallery North; Boeing Gallery South; Wrigley Square and Millennium Park Monument; McCormick Tribune Plaza and Ice Rink; and Crown Fountain. Sidewalks surround Millennium Park and

8

connect to sidewalks within the Park, which connect the rooms but are not part of the rooms. The making of speeches and the passing out of written communications shall be restricted to Wrigley Square and Millennium Park Monument and the sidewalks in and around the Park, though closed sidewalks, whether for an event or another reason, shall not be available for this purpose.

[1] at 36.

### 3.     The City's Enforcement of the Rules

Ann Hickey, the Deputy Commissioner of Facilities for DCASE, testified at the evidentiary hearing. In her role as Deputy Commissioner, Hickey oversees the operations and management of the Park. [48-2] at 132.

As Hickey acknowledges, P(3) of the current rules prohibits "the making of speeches" and passing out written communication everywhere in the Park but Wrigley Square and on sidewalks. *Id.* at 135–36. When asked what constitutes "speech" as contemplated in the rules, Hickey testified that "speech" depends upon the "intent of the speaker," as opposed to the number of people involved, how loud it is, or the length of time a person speaks. *Id.* at 139–41.

Hickey further testified that Park security officers bear the responsibility to initially determine whether someone violates the Park rules. *Id.* at 171. Based upon the hearing, however, these officers receive no training as to how they should assess the intent of any given speaker or whether his or her speech "objectively interferes with visitors' ability to enjoy the Park's artistic displays, including, but not limited to," the illustrative examples noted in the rules. *Id.* at 154–55.

9

## II.    Legal Standard

A preliminary injunction constitutes "an extraordinary remedy" reserved for exceptional cases. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008).  As such, a party seeking a preliminary injunction must establish it has a likelihood of success on the merits, *Adkins v. Nestle Purina PetCare Co.,* 779 F.3d 481, 483 (7th Cir. 2015), that it has no adequate remedy at law, and that it will suffer irreparable harm if a preliminary injunction is denied, *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *see also Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014).

If the moving party meets these threshold requirements, this Court then "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Stuller*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  To do so, this Court must also consider the public interest in granting or denying the injunction.  *Id.*  This Court uses a "sliding scale approach" when weighing these considerations. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

## III.    Analysis

Plaintiffs and Intervenors (collectively, Movants) seek to enjoin the City's enforcement of P(1) and P(3).  The City defends its enforcement of the rules on the merits, and additionally argues that Movants lack standing to sue.  As a jurisdictional question, the issue of standing comes first in this Court's analysis.  *Ortiz v.*

10

*Fibreboard Corp.*, 527 U.S. 815, 831 (1999); *Hinrichs v. Speaker of House of Reps. of Ind. Gen. Assembly*, 506 F.3d 584, 590 (7th Cir. 2007); *Halperin v. Int'l Web Servs., LLC*, 70 F. Supp. 3d 893, 897 (N.D. Ill. 2014).

## A.  Standing

Article III of the Constitution limits "federal judicial power to certain 'cases' and 'controversies.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)).  To establish Article III standing, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Id.* at 173 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Lujan*, 504 U.S. at 560–61).  The party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing.  *Lujan*, 504 U.S. at 561.

The City raises two standing arguments.  First, the City contends that, because no evidence exists that Movants have attempted to engage in First Amendment activities under the revised rules, they lack injuries in fact.  [52] at 23–24; [48] at 3–4.  Not so.  Movants need not demonstrate actual attempts to engage in protected activity at the Park to establish injuries in fact.  Rather, chilled speech undoubtedly constitutes an injury supporting standing.  *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012).  Here, Movants claim that they intend to engage in conduct protected by the First Amendment—namely, evangelizing and passing out petitions—but remain

hampered by the City's current restrictions. *E.g.*, [46] at 3; [49] at 2. The record also contains evidence that Movants faced opposition from the City (including threat of arrest) when they engaged in protected activities in the past, thus supporting their credible assertion that the City's rules have chilled their speech. *See Bell*, 697 F.3d at 454–55; *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012) (finding the chilling effect of protected speech alone sufficient to establish an injury, where the plaintiffs possessed a well-founded fear that a law will be enforced against them). Movants thus sufficiently demonstrate that they possess injuries in fact.

Second, the City argues that Intervenors cannot satisfy the redressability prong, contending "there is nothing for the Court to redress" because no other events were scheduled to take place at the Pritzker Pavilion and Great Lawn in 2019. [48] at 4. Absurdly, this argument assumes Intervenors only seek to gather signatures through the end of 2019, when, in truth, Intervenors explicitly (and credibly) assert that they intend to continue circulating petitions in the future. [49] at 2. As a result, this Court can plainly redress the Intervenors' purported injury—namely, by issuing the requested injunction. Having rejected the City's standing arguments, this Court turns now to the merits of the case.

### B.    Likelihood of Success:  Freedom of Speech

The United States Constitution prohibits the government from enacting laws "abridging the freedom of speech." U.S. Const. amend. I. A person's right to exercise free speech, however, is not absolute; even "protected speech is not equally permissible in all places and at all times." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011)

(quoting *Frisby v. Schultz*, 487 U.S. 474, 479 (1988)). Courts apply a three-step process to analyze First Amendment free speech claims: (1) determine whether the plaintiff's conduct constitutes protected speech; (2) identify the nature of the forum; and (3) determine whether the means and "justifications for exclusion" from the relevant forum "satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

### 1. Protected Activity

The City does not dispute that Movants' activities constitute protected First Amendment activities. Nor could it. If nothing else at all, the First Amendment protects religious speech, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995), and the freedom to petition, *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Indeed, such speech lies at the very heart of the First Amendment. Movants therefore establish the first element of their free speech claims.

### 2. The Nature of the Forum

Next, the extent to which the government can control access depends upon the classification of the relevant forum. *United States v. Kokinda*, 497 U.S. 720, 726 (1990). Historically, the Supreme Court recognizes three forums in the First Amendment context: (1) the traditional public forum; (2) the designated public forum; and (3) the nonpublic forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983); *see also Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011). More recently, the Supreme Court has also recognized a fourth type of forum: the limited public forum. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001).

Movants seek general access to the entirety of the Park to engage in their protected activities, so this Court considers the Park the relevant forum. *See Cornelius*, 473 U.S. at 801; *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1151 (7th Cir. 1995) (internal quotation marks omitted) ("If a speaker seeks general access to an entire piece of public property, then that property is the relevant forum."). The Supreme Court expressly recognizes streets, sidewalks, and parks as traditional public forums. *United States v. Grace*, 461 U.S. 171, 177 (1983); *see also Surita*, 665 F.3d at 875. Traditional public forums "are defined by the objective characteristics of the property," and thus remain "open for expressive activity regardless of the government's intent." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).

Certainly, given the record here, the Park fits the bill as a traditional public forum: it is free, open to the public, and serves as a public thoroughfare. [48-2] at 86, 157–58; *see Kokinda*, 497 U.S. at 727 (considering whether sidewalk constituted a thoroughfare for purposes of assessing nature of forum); *Freedom from Religion Found., Inc. v. City of Marshfield, Wis.*, 203 F.3d 487, 494 (7th Cir. 2000) (holding that a city park, though owned privately, constituted a traditional public forum because of its public use). Despite all this, the City argues that the Park instead qualifies as a nonpublic forum. *See* [40-1] at 12–13. Specifically relying upon the intent of the Park's creators, the City contends that the Park falls outside the run-of-the-mill public park category, because it has been "designed and maintained" as a

14

"space of refuge" from the surrounding urban areas and contains "curated art galleries and natural plantings." [40-1] at 12.

The City relies heavily upon *Oberwetter v. Hilliard*, where the D.C. Circuit held that the interior of the Jefferson Memorial constituted a nonpublic forum, even though it sits within a national park. 639 F.3d 545, 552 (D.C. Cir. 2011). The court reasoned that all national memorials serve as "places of public commemoration, not freewheeling forums for open expression," and thus the government may "reserve them for purposes that preclude expressive activity." *Id.* And indeed, the Jefferson Memorial serves a "solemn commemorative purpose" that the court determined "incompatible" with broad freedoms permitted in traditional public forums. *Id.*

The City also cites a Second Circuit case ruling that the plaza surrounding Lincoln Center did not constitute a traditional public forum even though the city defined it as a "park" for purposes of establishing the park department's authority over it. *Hotel Emps. & Rest. Emps. Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 552 (2d Cir. 2002). The court found dispositive that the plaza serves as a "forecourt" to Lincoln Center, a nonpublic performing arts hall, and therefore did not constitute a "public artery." *Id.* at 551–52.

And finally, the City cites *Chicago Acorn v. Metropolitan Pier Exposition Authority*, where the Seventh Circuit held that the internal sidewalks within Chicago's Navy Pier did not constitute traditional public forums. 150 F.3d 695, 702 (7th Cir. 1998). The court noted that: (1) Navy Pier constitutes a "discrete, outlying

segment or projection of Chicago rather than a right of way;" and (2) the internal sidewalks at issue led only to pier facilities and were not "through routes." *Id.* Years later, in *Marcavage v. City of Chicago*, the Seventh Circuit again considered the nonpublic nature of Navy Pier, emphasizing that the pier primarily houses stores, restaurants, and theaters, thus rendering it a "private enterprise with a tangential public benefit." 659 F.3d 626, 633 (7th Cir. 2011).

Based upon the evidence here, the Park stands in stark contrast to the forums at issue in those cases. Unlike the interior of the Jefferson Memorial (a small, "non-through route" area), the nature and purposes of the Park extend far beyond the commemorative purposes of a national memorial. Nor does the Park constitute a "forecourt" to a nonpublic forum; the Park is itself a public forum. And finally, in contrast to Navy Pier, the Park does not constitute a discrete segment or projection of Chicago, containing private enterprises with only a tangential public benefit. Rather, the Park sits right in the heart of the City, bordered by Michigan Avenue, Monroe Street, Randolph Street, and Columbus Drive. [48-2] at 51. And in sharp contrast to Navy Pier's internal sidewalks (leading primarily to commercial businesses), the Park also exists as an open space and thoroughfare, *id.* at 86, full of public spaces serving non-commercial purposes.

In sum, the City may not by "its own *ipse dixit*" destroy the public forum status of parks. *Grace*, 461 U.S. at 180 (internal quotation marks omitted); s*ee also Forbes*, 523 U.S. at 678. Although the City insists a curated design divests the Park of its traditional public nature, this Court cannot accept this characterization based upon

the facts here. Indeed, if a "curated design" were enough to transform the nature of the forum, any park with a statue could lose its First Amendment protections. The law precludes this absurd result.

Consequently, for the purposes of the requests for a preliminary injunction, the Movants have shown a likelihood of success on the merits in establishing that the Park constitutes a traditional public forum.[1]

### 3.    Content-Neutral or Content-Based

When the forum constitutes a traditional public forum, courts apply one of two levels of judicial scrutiny to determine whether the government has enacted a constitutionally permissible restriction. Courts apply strict scrutiny to content-based restrictions—that is, the City may only "enforce a content-based exclusion" that is both "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45; *Price v. City of Chi.*, 915 F.3d 1107, 1112 (7th Cir. 2019). On the other hand, courts apply intermediate scrutiny to content-neutral restrictions. *Price*, 915 F.3d at 1112. The government survives intermediate scrutiny if it imposes reasonable and content-neutral restrictions as to time, place and manner, provided these restrictions remain "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45; *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2239 (2015); *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 (1984).

---

[1]At this early stage of the proceedings, this Court offers no opinion as to whether the City might ultimately prevail in defending more narrowly tailored and more easily justified restrictions targeting specific subspaces (such as the Great Lawn).

Courts consider a restriction content-based if it: (1) on its face, "applies to particular speech because of the topic discussed or the idea or message expressed"; or (2) though "facially content neutral," cannot be "justified without reference to the content of the regulated speech," or was "adopted by the government because of disagreement with the message [the speech] conveys." *Reed*, 135 S. Ct. at 2227 (internal quotation marks omitted); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

### a.   P(3)

This Court must first determine whether P(3) constitutes a content-based or content-neutral restriction. On its face, P(3) contains a blanket restriction as to the "making of speeches and the passing out of written communications" in all but two Park subspaces without regard to the identity of the individuals engaging in the particular conduct, or to the message embodied in the "speeches" and "written communications."[2] Accordingly, at least facially, P(3) appears to be content-neutral because its plain text draws no distinctions based upon the message a speaker conveys. *Reed*, 135 S. Ct. at 2227.

The evidence presented at the hearing, however, told another story and made patently clear that the City implements P(3) as a content-based restriction. For example, when asked what the "making of speeches" means as defined in P(3), Hickey testified that, under the City's interpretation, its application does not depend upon

---

[2] As noted above, P(3) states in relevant part: "The making of speeches and the passing out of written communications shall be restricted to Wrigley Square and Millennium Park Monument and the sidewalks in and around the Park, though closed sidewalks, whether for an event or another reason, shall not be available for this purpose."

objective, content-neutral factors such as the number of individuals involved, the volume of the speech, or the duration of the speech. [48-2] at 140. Indeed, when asked whether specific content, such as a prayer, constitutes the "speech" contemplated in P(3), Hickey responded: "It would depend on how they are doing it. . . . it's the making of speeches is what is in the rules. So if that is the intent on what they're doing, then it would be prohibited." *Id.* And ultimately, in response to another clarifying question from this Court, Hickey testified again that the definition of speech-making must be assessed by looking to the "intent of the speaker." *Id.* at 141. Given such concessions at the hearing, the City's restrictions, in fact, make clear "reference to the content of the regulated speech" in deciding whether a message constitutes speech-making under P(3). *Reed*, *supra*, at 2227.

The City's approach to P(3), as articulated by Hickey, is constitutionally flawed in several respects. First, based upon the hearing, the City applies P(3) based upon the identity of the speaker; that alone renders P(3) content-based. *See Surita*, 665 F.3d at 870 ("Restrictions that favor or disfavor certain speech based on the speaker rather than the content of the message are still content based."). Second, by assessing a speaker's intent, the City must necessarily evaluate the content of speech: Simply put, how can one assess intent without evaluating the substance revealing that intent? *E.g.*, *Price*, 915 F.3d at 1118 (noting that "divining" the purpose of speech requires enforcement authorities "to examine the content of the message that is conveyed.") (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)). Because the City enforces P(3)'s prohibition against the "making of speeches" by referencing its

content, P(3) constitutes a content-based restriction. *See Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 643 (1994) ("As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based."); *cf. Schultz v. City of Cumberland*, 228 F.3d 831, 840–41 (7th Cir. 2000) (content-neutral restrictions require "no consideration of content before applying" them).

The same conclusion applies to P(3)'s prohibition against the "passing out of written communications," because the City's enforcement once again depends upon the content of that communication. For instance, at the hearing, Stewart conceded that Moby Dick constitutes a "written communication," but equivocated when asked whether passing out Moby Dick would constitute a violation under the current rules enforced by the City. [48-2] at 85–86. Stewart's testimony confirms that the City would not invoke P(3) to stop someone from passing out Moby Dick, as it did to stop Movants from disseminating religious and petition-related literature. This testimony underscores the City's problem: despite P(3)'s facial-neutrality, the City enforces P(3)'s vague provisions in a discriminatory manner based upon the intent of the speaker and content of the speech. Such enforcement violates the First Amendment.

### b.     P(1)

Like P(3), the text of P(1) appears content-neutral on its face. P(1) provides:

> 1. Conduct that objectively interferes with visitors' ability to enjoy the Park's artistic displays, including, but not limited to, substantially impairing pedestrian traffic, disrupting views of the art, or conduct that endangers public health or safety, may damage Park property, or is prohibited by applicable federal, state, and local laws, is prohibited in the Park.

[1] at 36.  By its plain language, P(1) appears to ban all manner of interference with other visitors' enjoyment of the Park.

But like P(3), this Court finds that P(1) constitutes a content-based restriction, particularly as to the portion concerning conduct that "objectively interferes with visitors' ability to enjoy the Park's artistic displays."  At the hearing, Stewart testified that, even though the text of P(1) requires the City to make an "objective determination," no actual objective standards exist in the City's rules or enforcement policies.  [48-2] at 83.  According to Stewart, potential violations of P(1) could include, for example, people taking selfies in front of the Bean, someone wearing a "funny looking hat that distracted people," or even a group of tall tourists.  [48-2] at 83–84.  Yet, per Stewart, a "noisy class trip of preschoolers" would *not* violate P(1) because "they're too short."  *Id.* at 84.  Highlighting the grave constitutional concerns raised by the breadth of P(1)'s language (particularly the phrase "including, but not limited to"), the testimony underscored the subjective nature of the City's enforcement, which restricts speech far beyond the five examples listed within the rule.  Indeed, the inclusion of the catch-all phrase permits arbitrary enforcement for any reason or no reason.  Again, such enforcement violates the Constitution.

Because the evidence shows that the City enforces P(1) with reference to the identity of the speaker and the content of the speech, *Surita*, 665 F.3d at 870; *Schultz*, 228 F.4d at 840–41, P(1) constitutes a content-based restriction.

#### 4.    Strict Scrutiny

Having determined that P(1) and P(3) are content-based, this Court applies the strict scrutiny framework to both restrictions.  As a threshold matter, content-based restrictions are presumptively invalid.  *United States v. Stevens*, 559 U.S. 460, 468 (2010); *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 716 (7th Cir. 2003).  To survive strict scrutiny, the City bears the heavy burden to show that its restrictions remain "narrowly tailored to promote a compelling Government interest."  *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)).  A restriction fails this test if a "less restrictive alternative" exists to serve the City's compelling interest.  *Id.*

#### a.    Compelling Interests

First, this Court evaluates the existence of compelling interests.  Complicating this Court's task, the City's briefs fail to precisely set forth what it believes those interests might be.  [40-1] [48].   Nevertheless, the ostensible goal of P(1)'s text appears to be banning conduct that "objectively interferes with visitors' ability to enjoy the Park's artistic displays."  Consistent with this text, the testimony at the evidentiary hearing suggests that the City wrote P(1) and P(3) to preserve the aesthetics of the Park and protect visitors' enjoyment of Park art and programming. For instance, Stewart testified that opening areas of the Park up to First Amendment activities would transform the Park from a "primarily peaceful architectural artistic expression space" into a space "where the art and the architecture are not the primary focus." [48-2] at 72.  Similarly, Hickey testified that the City intended the Park to be "an outdoor cultural center," *id.* at 166, and that in adopting the rules, the City

22

discussed potential "disturbances and interferences" with Park programming, *id.* at 171.

On the current record, however, the City fails to justify its restrictions. Although the Supreme Court has recognized that aesthetic interests constitute *significant* government interests, it has not found such interests to be *compelling*. *Compare, e.g.*, *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) (recognizing aesthetics as a significant government interest) *with City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) (affirming a lower court holding that interest in preserving aesthetics did not constitute a sufficiently compelling government interest). Indeed, some federal appellate courts have explicitly rejected classifying aesthetics as a compelling interest. *See, e.g.*, *Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 1001 (8th Cir. 2019); *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016).

Likewise, the parties fail to cite any authority suggesting that protecting visitors from artistic disruptions can constitute a compelling interest. Rather, courts have rejected attempts to paint such fears as a compelling interest. *See Norton v. City of Springfield*, 324 F. Supp. 3d 994, 1002 (C.D. Ill. 2018) ("It is also not a compelling state interest for a government to protect listeners from 'unwanted communication' and to protect unwilling listeners' privacy interests in a public forum.") (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)); *Berger v. City of Seattle*, 569 F.3d 1029, 1056 (9th Cir. 2009) (rejecting city's proffered interest "in

protecting certain park-goers from communications by others" as sufficiently "substantial" to justify a content-based restriction).

And even if prior precedent supported this Court's recognition of those interests as compelling in the abstract, the City has not demonstrated that those interests are sufficiently compelling within the context of this case. To withstand strict scrutiny, the City must prove that its restrictions remain "necessary to serve" the asserted government interest. *Burson v. Freeman*, 504 U.S. 191, 199 (1992). To do so, the City cannot rely upon "anecdote and supposition," *Playboy Entm't Grp.*, 529 U.S. at 822; rather, it "must specifically identify an 'actual problem' in need of solving," *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *Playboy*, 529 U.S. at 822). Here, the City again fails.

The record contains no evidence that Movants' protected activities unreasonably interfered with the Park's art or unduly disrupted others' enjoyment of art or other programming. To the contrary, Stewart conceded that "almost no one lodged complaints about their inability to enjoy the art" in the Park, even before the current Park restrictions became effective. [48-2] at 82. Additionally, during closing argument, the City conceded it lacked any evidence showing that open air evangelizing disturbed anyone, and ultimately admitted that its conclusion that such conduct is "disturbing or annoying or distracting" is premised solely upon "common sense." [52] at 27. Thus, the City's purported need for the broad restrictions stems solely from speculation that constitutionally protected activity "would harm" or

"would deleteriously impact" the Park's aesthetic values and the public's enjoyment of art. *See* [40-1] at 5.

Without any specific evidence of an actual problem in need of solving, the City fails to show a compelling state interest to justify its significant restrictions. *See Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest."). On this basis alone, Movants demonstrate the likelihood of success on the merits of their free speech claims.

### b.     Narrowly Tailored

Significantly, even if the City could demonstrate the existence of a compelling interest, it cannot show that its restrictions are narrowly tailored.  In the context of a strict scrutiny analysis, the relevant question is whether less restrictive alternatives exist to accomplish the government's goals. *Playboy Entm't Grp.*, 529 U.S. at 816.  Here, they unquestionably do.

P(3) prohibits the "making of speeches" and "passing out of written communications" in the vast majority of the Park.  But Hickey testified that the City enforces this prohibition "even where there is no art present."  [48-2] at 154.  Thus, by the City's own admission, P(3) fails to constitute the least restrictive means of ensuring the purported preservation of Park aesthetics.  Nor is P(3) narrowly tailored to the City's purported goal of protecting other visitors' enjoyment of Park art and programming.  Put simply, one could easily conceive a variety of less restrictive (and content-neutral) alternatives for achieving that goal.

Likewise, P(1) sweeps too broadly. Without any reference to actual objective criteria, it prohibits all conduct that "objectively interferes with visitors' ability to enjoy the Park's artistic displays." [48-2] at 83. As the City acknowledges, a wide range of lawful examples fall within the ambit of P(1)'s prohibition, including the absurd notion of prohibiting a group of "tall" tourists (noted in Stewart's testimony). [48-2] at 84. And therein lies another constitutional flaw: P(1) prohibits speech far beyond what the City can prove is necessary to further any legitimate goals.

In short, P(1) and P(3) both fail the narrowly tailored test, and Movants demonstrate a likelihood of success on the merits of their free speech claims on this basis as well.

### 5. Intermediate Scrutiny

Although not necessary in light of this Court's findings above, this Court finds that the City fails to satisfy even the less exacting—but still demanding—intermediate scrutiny framework.

In cases involving content-neutral restrictions, the government must demonstrate that the prohibitions remain "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45; *see also Joelner v. Vill. of Washington Park, Ill.*, 508 F.3d 427, 431 (7th Cir. 2007). Even if a restriction is content-neutral, the government cannot ban speech "in a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 91 U.S. at 799.

The restrictions cannot withstand even intermediate scrutiny. As discussed above, the record contains no evidence supporting a nexus between the City's broad

26

prohibitions on expression and its asserted government interests of preserving the artistic integrity of the Park and preventing disruption to other citizens' general enjoyment of the Park. The City offers only speculation that its interests are actually—as opposed to possibly—significant, and no evidence exists to suggest that the City has otherwise narrowly tailored its restrictions to those interests. *See McCullen*, 573 U.S. at 493. Indeed, the City offered no justification for distinguishing between visitors' enjoyment in Wrigley Square—where speech is allowed—and the rest of the Park—where it is not.

### 6. Vagueness

This Court also finds that Movants are likely to succeed on their free speech claims on an additional ground: vagueness.

An ordinance is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes," or if it is "so standardless that it invites arbitrary enforcement." *United States v. Davis*, 139 S. Ct. 2319, 2342 (2019) (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2554 (2015)); *United States v. Burrows*, 905 F.3d 1061, 1063 (7th Cir. 2018). Regulations on speech must "meet a higher standard of clarity and precision" because they risk forcing speakers to self-censor. *Barland*, 751 F.3d at 835; *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254–55 (2012) (vagueness of content-based restrictions raise special concerns because of their "obvious chilling effect") (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 872 (1997)). For this reason, courts scrutinize restrictions carefully when they implicate First Amendment concerns. *Barland*, 751 F.3d at 835.

Neither P(3) nor P(1) provides fair notice of what conduct they prohibit, leaving only the City—or an individual security officer employed by the City—to decide whether speech should be banned. As Hickey testified, determining whether speech violates the Park rules "depends upon the actual situation" and requires security "to be able to interpret what the exact situation was." [48-2] at 170. This testimony, combined with her other testimony that a violation of P(3) depends upon an assessment of intent, makes clear that the City arbitrarily enforces P(3) based upon a variety of undefined factors including (most problematically) a subjective assessment of the message the speaker intends to convey. *See, e.g.*, *Foti v. City of Menlo Park*, 146 F.3d 629, 638–39 (9th Cir. 1998) (finding a city ordinance regulating the display of signs on parked cars unconstitutionally vague where enforcement would require city police officers to "decipher the driver's subjective intent"). Likewise, P(1) prohibits a wide swath of "disruptive conduct," untethered to any objective (or content-neutral) criteria. Thus, the City enjoys unfettered discretion in determining what speech falls under that restriction and offers little guidance to an ordinary person of what exactly the rules prohibit.

Considering the above, this Court finds that Plaintiffs and Intervenors have demonstrated a likelihood of success in proving P(3) and P(1) unconstitutionally vague.

### 7.    The Government Speech Doctrine

Before turning to the remaining preliminary injunction factors, this Court addresses the City's primary defense of P(3) and P(1), which rests upon its misapplication of the government speech doctrine. *See* [48] at 4–8. The City contends

that, by curating art and programming, it exercises permissible government speech making its restrictions immune to First Amendment attack because the rules further such government speech. [48] at 8. This Court rejects the City's flawed reading of this important doctrine.

The government speech doctrine recognizes that the government may also engage in speech and that the First Amendment does not regulate government speech as it does private speech. *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553, 125 S. Ct. 2055, 2058 (2005) (the government's own speech "is exempt from First Amendment scrutiny."). Courts apply the government speech doctrine in two limited contexts: (1) when the government itself speaks; or (2) if the government appropriates public funds to transmit a message through private speakers. *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 461 F. Supp. 2d 666, 669 (N.D. Ill. 2006); *see also, e.g.*, *PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 166 (E.D.N.Y. 2016).

Neither of those situations are present here. This case does not involve the appropriation of public funds to transmit a message through private speakers. Nor do Movants challenge the government's own speech; obviously, the City has the right to present curated art and programming. Instead, Movants challenge whether the City can permissibly, through its enactment of Park rules, limit their ability to engage in protected activity on Park property. The government speech doctrine is inapplicable where, as here, the relevant question concerns whether the City's rules unconstitutionally restrict private speech on public property. *Pleasant Grove City,*

*Utah v. Summum*, 555 U.S. 460, 469–70 (2009) (the government "does not have a free hand to regulate private speech on government property," and the government speech doctrine does not apply when the government is merely "providing a forum for private speech."); *see also, e.g.*, *Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cty. Sch. Dist. No. 9*, 880 F.3d 1097, 1105 (9th Cir. 2018) (rejecting application of the government speech doctrine to a First Amendment challenge by a teachers' union to a school district's policies regarding a teachers' strike because the plaintiffs did not contest the district's ability to express its position, but rather, the district's limitation of their rights to express their own views).

### C.   Other Preliminary Injunction Factors

This Court's analysis of the other preliminary injunction factors requires little discussion. In First Amendment cases, the likelihood of success is dispositive because the loss of First Amendment freedoms—even for minimal periods of time—constitutes an irreparable injury, and protecting First Amendment freedoms always serves the public interest. *Higher Soc'y of Ind. v. Tippecanoe Cty., Ind.*, 858 F.3d 1113, 1116 (7th Cir. 2017); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). This Court thus grants Movants' requests for preliminary injunctive relief.[3]

## IV.   Conclusion

For the reasons stated above, this Court grants Plaintiffs' motion for preliminary injunction [7], and grants Intervenors' motion for preliminary injunction

---

[3] Plaintiffs move for preliminary injunctive relief only on their First Amendment free speech claim. [7]. Intervenors appear to move on both their First Amendment and Illinois law claims. *See* [49]. Because the scope of the preliminary injunction would be the same under both claims, this Court need not address the merits of the Illinois law claim.

[35]. Because a temporary restraining order issued after notice and hearing is functionally and procedurally akin to a preliminary injunction, *Chi. United Indus., Ltd. v. City of Chi.*, 445 F.3d 940, 946 (7th Cir. 2006); *Levas & Levas v. Vill. of Antioch, Ill.*, 684 F.2d 446, 448 (7th Cir. 1982), this Court denies as moot Plaintiffs' motion for temporary restraining order [22].

Rule 65(c) provides: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Courts, however, may waive the bond requirement where "there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Here, Plaintiffs request waiver of the bond requirement, [7] at 2, and the City has neither objected to the waiver of bond nor demonstrated any costs or monetary damages that might result from issuance of the injunction. Under these circumstances, this Court exercises its discretion to waive Rule 65(c)'s bond requirement.

31

This Court contemporaneously enters a separate preliminary injunction order consistent with this opinion.

This Court additionally sets a status hearing for March 4, 2020 at 9:45 a.m. in Courtroom 1203.

Dated: February 20, 2020

Entered:

John Robert Blakey
United States District Judge